**MORRISON COHEN LLP**
909 Third Avenue
New York, NY 10022
(212) 735-8600
Joseph T. Moldovan
David J. Kozlowski
Latisha V. Thompson
Christopher W. Pendleton
*Attorneys for CSC 4540, LLC, 45-50 Vernon LP,*
*JSMB 4540 LLC and JSMB 4540 MM LLC*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>VERNON 4540 REALTY, LLC,<br><br>     Debtor. | Chapter 11<br>Case No. 20-22919 (RDD) |
| CSC 4540, LLC, 45-50 VERNON LP, JSMB 4540 LLC, and JSMB 4540 MM LLC,<br><br>     Plaintiffs,<br><br>  v.<br><br>VERNON 4540 REALTY, LLC, and BRENT CARRIER<br><br>     Defendant. | Adversary Proceeding<br><br>Case No. _____ (SCC) |

**COMPLAINT FOR DECLARATORY JUDGMENT, TURNOVER, AND
PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF**

  Plaintiffs CSC 4540, LLC, 45-50 Vernon LP, JSMB 4540 LLC and JSMB 4540 MM

LLC, as and for its Complaint against Defendants Vernon 4540 Realty, LLC and Brent Carrier

respectfully states as follows:

1

## INTRODUCTION

1.      Plaintiffs CSC 4540, LLC ("CSC"), 45-50 Vernon LP ("Vernon LP"), JSMB 4540 LLC ("JSMB") and JSMB 4540 MM LLC ("JSMB MM," together with CSC, Vernon LP and JSMB, "Plaintiffs") commence this adversary proceeding to ensure that certain brownfield tax credits ("Brownfield Tax Credits"), which are actually a tax refund from the State of New York estimated to be worth at least $1.9 million and as much as $2.3 million (the "Tax Refund"), and which are the property of Vernon 4540 Realty, LLC (the "Debtor"), are declared property of and delivered to the Debtor's bankruptcy estate (the "Estate").

2.      Plaintiffs bring this action for the benefit of all creditors of the Estate to protect this critical asset of the Estate—likely its only cash asset—because the Debtor's principal and managing member, Brent Carrier ("Carrier"), in a blatant breach and disregard of the Debtor's fiduciary duties to the creditors of this estate, contends that the Tax Refund belongs to him and not the Estate and has stated under oath that he intends to keep the Tax Refund for his personal benefit.

3.      This action is required because Carrier testified at the Section 341 Hearing held in this case on October 14, 2020 that he has already applied for the Brownfield Tax Credits. This sets in motion a process where the Tax Refund will in fact be made to Carrier by the State of New York, not because he personally has the right to the funds, but only because the Debtor is a limited liability company and as such is a disregarded entity for tax purposes. Because of this status, the principal of the Debtor, Carrier, is the only person authorized to seek the Brownfield Tax Credits from the State of New York on behalf of the Debtor, and the State of New York can only send the Tax Refund to Carrier.

4.     Carrier further testified at the Section 341 Hearing that although he has applied for a Tax Refund of the Brownfield Tax Credits belonging to the Debtor, he will not deliver the Tax Refund from the Brownfield Tax Credits to the Estate upon receipt.

5.     Carrier has taken the position that although the Brownfield Tax Credits belong to the Debtor pursuant to the CSC Operating Agreement, the Brownfield Tax Credits and forthcoming Tax Refund became his, when he, as managing member of the Debtor unilaterally decided that the tax credits belong to him.  This is simply nonsense.  While Carrier's allocation of the Debtor's tax credits is necessary to collect the credits due to the pass-through nature of the LLC corporate form, Carrier's position is an unjustified leap that right, title and interest in the Tax Refund belongs to him.  Carrier's position would permit a wrongful taking of an Estate asset at best, or worse, a fraudulent conveyance of an asset to an insider of the Debtor.

6.     Despite what Carrier claims, the law and the facts are clear: the Tax Refund is property of the Estate. Carrier is merely an instrument needed to effect obtaining the Tax Refund.  Ultimately, he has no personal rights to the funds and he has a fiduciary obligation to deliver the payment to the Estate for the benefit of the creditors of this Estate.  Any other result while the Debtor is in bankruptcy would invariably benefit the insider of the Estate and prejudice its creditors.

7.     Plaintiffs are accordingly forced to commence this Adversary Proceeding seeking (i) a declaration that all Brownfield Tax Credits are property of the Estate; (ii) an order requiring Carrier to turnover all Brownfield Tax Credits paid to him by the State of New York on behalf of the Debtor because Carrier, who is an estate fiduciary, has stated he has no intention of turning the funds over for the benefit of the Debtor's creditors; or, in the alternative (iii) an injunction preventing Carrier from withdrawing, transferring, pledging, allocating, encumbering, assigning,

dissipating, concealing or otherwise diminishing in value the Tax Refund from the Brownfield Tax Credits issued by the State of New York pending further order of the Court concerning the claims at issue in this adversary proceeding.

## THE PARTIES

8.     Plaintiff CSC 4540, LLC is a New York limited liability company with its principal place of business located at c/o Quadrum Global, 261 Fifth Avenue, Suite 1801, New York, NY 10016.

9.     Plaintiff 45-50 Vernon LP is a limited partnership with its principal office located at 407 Lincoln Road, Suite 304, Miami Beach, FL 33139. Vernon LP is the holder of 930 Class A Units, representing 93 percent of the Class A interest in CSC 4540, LLC, and is the current managing member of CSC 4540, LLC.

10.     Plaintiff JSMB 4540 LLC is a New York limited liability company, having a registered office address of c/o SDG, 230 Park Avenue, Suite 539, New York, New York 10169. JSMB is the holder of 70 Class A Units, representing 7 percent of the Class A interest in CSC 4540, LLC. Prior to April 2018, JSMB served as managing member of CSC 4540, LLC.

11.     Plaintiff JSMB 4540 MM LLC is a New York limited liability company, having a registered office address of c/o SDG, 230 Park Avenue, Suite 539, New York, New York 10169. JSMB MM is the holder of 1000 Class C Units, representing 100 percent of the Class C interest in CSC 4540, LLC.

12.     Defendant and Debtor Vernon 4540 Realty, LLC is a Delaware limited liability company with a principal place of business c/o Brent Carrier, 45 Carleon Avenue, Larchmont, NY 10538. Vernon 4540 is the holder of 1000 Class B Units, representing 100 percent of the

Class B interest in CSC 4540, LLC. (*See* Organizational Chart of all parties, attached hereto as **Exhibit A**).

**JURISDICTION AND VENUE**

13.     This adversary proceeding is brought pursuant to 11 U.S.C.§§ 105(a), 541, 542, 105(a) and Rule 7001 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), in order to obtain a declaratory judgment regarding certain Brownfield Tax Credits that are property of the Estate and an order directing the turnover of those Brownfield Tax Credits to the Debtor, or, in the alternative, an injunction preventing Carrier from spending, transferring, allocating, selling, or otherwise disposing of the Brownfield Tax Credits.

14.     This Court has jurisdiction over this adversary proceeding by virtue of 28 U.S.C. §§157(a) and (b), 1334(b), and the "Standing Order of Referral of Cases to Bankruptcy Judges" of the United States District Court of New York (Ward, Acting C.J.), dated July 10, 1984. This Court has *in personam* jurisdiction over the Defendant pursuant to the applicable Bankruptcy Rules, as well as the facts set forth herein.

15.     This is a core proceeding under 28 U.S.C. §157(b)(2)(A), (E) and (O).

16.     Venue is proper in this district pursuant to 28 U.S.C. §1409(a) because this proceeding arises in the underlying Chapter 11 case pending in this district or arises in, or is related to, the underlying Chapter 11 case.

17.     Plaintiffs consent to the entry of a final order and judgment by this Court.

**FACTUAL ALLEGATIONS**

**A.     The Debtor Was Formed for the Purposes of Investing and Developing Real Property Pursuant to an LLC Agreement**

18.     The Debtor is single purpose entity formed for purposes of investing in and

developing a parcel of real property located at 45-40 Vernon Boulevard, Long Island, New York (the "Property" or the "Project").

19.     The Debtor is operated and controlled by its principal and managing member, Carrier, who is the ultimate beneficial owner of approximately 90% of the Debtor.

20.     On November, 15, 2013, the Debtor, along with Vernon LP, JSMB and JSMB MM formed CSC pursuant to an operating agreement (the "LLC Agreement"). CSC was formed for purposes of, *inter alia*, developing, owning, leasing and selling developing of a parcel of real property located at 45-40 Vernon Boulevard, Long Island City, New York (the "Property"), the site of the old Paragon Paint Factory. (LLC Agreement at § 3.1, attached hereto as **Exhibit B**).

21.     The LLC Agreement lists the Class A Members of CSC as Vernon LP and JSMB. The Debtor is listed as the sole Class B Member, and JSMB MM is the sole Class C Member. (*Id.* at 1).

22.     Prior to formation of CSC the Debtor owned the Property and, in need of capital, borrowed $7,030,000 from the soon-to-be Class A members while the parties negotiated the LLC Agreement. Upon the formation of CSC, the Debtor contributed the Property to CSC, which it owned, in exchange for 100 percent of the Class B Units in CSC.  The Debtor's loan was thereafter satisfied with CSC funds contributed by the Class A members.

**B.      The LLC Agreement Expressly Allocates One-Half of All Brownfield Tax Credits Earned By CSC to the Debtor**

23.     Due to its history as a paint factory, the Property was a brownfield site that required significant environmental remediation in order to be developed.

24.     The New York Environmental Conservation Law defines a brownfield site as "any real property where a contaminant is present at levels exceeding the soil cleanup objectives

or other health-based or environmental standards, criteria or guidance adopted by the department that are applicable based on the reasonably anticipated use of the property, in accordance with applicable regulations." N.Y. Envtl. Conserv Law § 27-1405(2).

25.     Environmental remediation of brownfield sites is incentivized by New York State pursuant to its Brownfield Cleanup Program, which provides, *inter alia*, tax credits to private-sector applicants who cleanup and redevelop these sites. *See* N.Y. Tax Law § 21 (listing tax credits for site preparation and cleanup of a site as the "site preparation credit component," tax credits for the redevelopment of a site as the "tangible property credit component," and tax credits related to groundwater remediation as the "on-site groundwater remediation component"). The tax credits are calculated as a percentage of qualifying expenditures incurred by the applicants in the cleanup and redevelopment processes. Specifically, the applicant becomes eligible to obtain a cash rebate totaling 28% of the qualifying remediation expenditures in the form of Brownfield Tax Credits.

26.     Importantly, Brownfield Tax Credits are "refundable," meaning that taxpayers who remediate a brownfield property receive a tax refund, rather than an actual tax credit, from the state. In other words, assuming the taxpayer's Brownfield Tax Credit is greater than his/her/its total New York State tax liability, the taxpayer receives the balance of the credit as a tax refund in cash. *Id.* at § 606(dd)(2).

27.     To qualify for Brownfield Tax Credits, "[a] person who seeks to participate in th[e Brownfield Cleanup Program] shall submit a request to the [New York State Department of Environmental Conservation ('DEC')]," *id.* § 27-1407(1); sign a brownfield site cleanup agreement with the State of New York, *see id.* § 27-1409; and obtain a certificate of completion ("Certificate of Completion") for satisfaction of the remediation requirements from the DEC, *see*

*id.* § 27-1419(3).

28. Issuance of a Certificate of Completion by the DEC affirms that the listed certificate holders ("Certificate Holders") have paid for and completed the preparation and cleanup of a site and are entitled to the receipt of Brownfield Tax Credits, calculated as a percentage of the qualifying remediation expenditures, for the site preparation credit component.

29. Accordingly, the LLC Agreement provides that CSC may:

> ([O]n its own behalf or through [the] wholly-owned [CSC affiliate, CSC 4540] Property Co [, LLC]) shall become a party to the Brownfield Cleanup Agreement with respect to the [Property] in order to be admitted into the Brownfield Cleanup Program. [CSC] (on its own behalf or through [the] wholly-owned Property Co[.]) ***shall apply or cause [the Debtor][1] or the Affiliate of [the Debtor]*** under the Entitlements Agreement[2] ***to apply, for Brownfield Tax Credits*** in connection with certain site preparation and cleanup, groundwater remediation, and tangible property development costs related to the Project.

(Ex. B at § 6.10) (emphasis added).

30. Section 8.2(b) of the LLC Agreement, in turn, contains a mechanism for the allocation of Brownfield Tax Credits earned by CSC. Specifically, the LLC Agreement provides:

> ***If [CSC] makes any expenditures qualifying for Brownfield Tax Credits***, then one-half of such qualifying expenditures and the related Brownfield Tax Credits shall be allocated among the Class A Members [Vernon LP and JSMB], *pro rata* in accordance with their respective Class A Units, and ***the other half of such expenditures and the related Brownfield Tax Credits shall be allocated to the Class B Member [Debtor]***.

(*Id.* at § 8.2(b)) (emphasis added).

---

[1] The Debtor is referred to as "CRE" throughout the LLC Agreement.

[2] At the same time as the parties executed the LLC Agreement, CRE Vernon Consulting, LLC ("CRE Consulting"), an affiliate of the Debtor, in which Carrier is also the principal, entered into a consulting agreement with CSC (the "Entitlements Agreement"). Pursuant to the Entitlements Agreement, CRE Consulting was to provide certain services relating to the procurement of certain permits, variances, approvals and, most importantly, obtain the Brownfield Tax Credits for the Project (the "Entitlements"). For its services, CRE Consulting was to be paid $50,000.

31.     In other words, one-half of any Brownfield Tax Credits earned by CSC are allocated to the Class B Member, the Debtor in this case, and the other half are allocated to the Class A Members, Vernon LP and JSMB.

**C.      Though Half the Brownfield Tax Credits Are Allocated to the Debtor, the Credits Are Paid By New York State Directly to the Debtor's Principal and Managing Member, Carrier**

32.     Importantly, because the Debtor is a limited liability company that has not elected to be treated as a corporation for tax purposes, any Brownfield Tax Credits received by it from the State of New York will, based upon the tax laws and advice Plaintiffs have received from the Office of the Attorney General of the State of New York, be paid directly to its principal and managing member.

33.     This means that because of the tax process, Carrier, as the principal and managing member of the Debtor – the sole Class B Member of CSC – will on behalf of the Debtor receive all the Brownfield Tax Credits due to the Debtor in the form of the Tax Refund. It does not mean that the Tax Refund belongs to Carrier.

34.     Carrier confirmed this process in recent testimony given at the Section 341 Hearing in this matter. *See* Section 341 Hearing Tr., Oct. 14, 2020, attached hereto as **<u>Exhibit C</u>**, at 56:15-19 (Assistant United States Trustee: "Who are the tax paying -- the individual tax paying members of [the Debtor]? That would be you. Right? Mr. Carrier: "It flows down through, so it's myself and the seven members of the LLC that own 20 percent of CRE Vernon [M]ember").

35.     For the sake of clarity, CRE Vernon Member owns 50% of the Debtor and has seven members of its own who cumulatively own 20% of CRE Vernon Member. Those seven members therefore indirectly own 10% of the Debtor and Carrier personally owns the remaining

90% (50% directly is his personal capacity, and 40% indirectly through his 80% interest in CRE Vernon Member). Most importantly, he is the Debtor's managing member and the individual who applies for Brownfield Tax Credits on its behalf.

**D.    When Environmental Remediation of the Property Was Completed, the Debtor Was Allocated Half of the Brownfield Tax Credits for Site Preparation and Cleanup Pursuant to the LLC Agreement**

36.    Environmental remediation of the Property was successfully completed in 2016, with nearly all costs borne by CSC, more specifically, by CSC's wholly-owned affiliate and the Property's owner, CSC 4540 Property Co., LLC ("Property Co.").

37.    A Certificate of Completion was issued by the DEC on December 15, 2016, and is attached hereto as **Exhibit D**. The Certificate of Completion was thereafter amended and reissued by the DEC on April 24, 2019 to include Property Co., which was improperly left off the initial certificate as a Certificate Holder. This amended Certificate of Completion means that Property Co. paid for the site preparation and cleanup of the Property and is entitled to receive Brownfield Tax Credits, totaling 28% of the qualifying remediation expenditures incurred in connection with the same. The amended Certificate of Completion is attached hereto as **Exhibit E**.

38.    Following this amendment, and pursuant to the LLC Agreement, one half of Property Co.'s site preparation and cleanup expenditures qualifying for the Brownfield Tax Credits were allocated to the Class B Member, the Debtor. (*See* Ex. B at § 8.2(b)). The qualifying remediation expenditures allocated by CSC to the Debtor total $6,872,291 (one-half of Property Co.'s total qualifying remediation expenditures).

39.    This allocation was effectuated through the issuance of an amended 2016 Schedule K-1 from CSC to the Debtor, attached hereto as **Exhibit F**. The amended 2016

Schedule K-1, which is subject to an ongoing audit, provides that the Debtor stands to receive a Tax Refund of approximately $1,924,241 (exactly 28% of the $6,872,291) from the Brownfield Tax Credits from New York State in connection with the preparation and cleanup of the Property. (*See* Ex. F, at 3 of 5 under "Partner's credit information"). Notably, however, Carrier's testimony at the Section 341 Hearing indicated that the Tax Refund could be worth as much as $2.3 million, 28% of the $8.3 million of the 2016 expenditures that Carrier stated were applied for by the Debtor. (*See* Ex. C at 120:17-23).

**E.  The Debtor's Ownership and Entitlement to the Brownfield Tax Credits Has Already Been Subject to State Court Proceedings, Where an Order of Attachment For the Tax Credits Was Issued Against the Debtor and In Favor of Plaintiffs**

40.  The prior New York State Court proceedings between the parties emanated from the 2017 misappropriation by the Debtor, through Carrier, of $250,000 from Plaintiff CSC. When confronted by the CSC Creditors, Carrier admitted that he took the funds and refused to return them.

41.  Plaintiffs accordingly initiated an arbitration against the Debtor and Carrier in June 2017 pursuant to the mandatory arbitration provision of LLC Agreement, seeking the return of the funds misappropriated by the Debtor and Carrier as well as damages for the Debtor's breach of the LLC Agreement and a related Settlement Agreement (*CSC 4540, LLC et al. v. Vernon 4540 Realty LLC, et al.*, AAA Case No. 01-17-0003-2604 (the "Arbitration")).

42.  Plaintiffs also initiated state court proceedings in aid of the Arbitration, securing a temporary restraining order and order of attachment prohibiting the Debtor and Carrier from transferring, removing, transporting, or secreting any assets from New York State to the extent of $250,000. Notwithstanding the Court's order of attachment and Plaintiffs' significant efforts in

connection with it, Plaintiffs were unable to locate and attach a single dollar of the Debtor's or Carrier's funds. Plaintiffs discovered the reason for this a month later, when Carrier admitted in open court that the misappropriated CSC funds were "gone . . . spent by [his affiliated entity]." A copy of the relevant portions of that court transcript is attached hereto as **Exhibit G**. (Ex. G at 9:1-9). In other words, Carrier caused his related entity which he controlled to dissipate the entire amount of CSC funds, in violation of a court-issued temporary restraining order and a subsequent order of attachment. To date, Plaintiffs have been unable to locate any liquid assets belonging to Carrier, who claims to be devoid of all income.

43.     Since June 2017, Plaintiffs have amended their claims in the Arbitration to include several additional breaches by the Debtor and Carrier of the LLC Agreement and the related settlement agreement. At present, Plaintiffs' claims against the Debtor and Carrier in the Arbitration total $6.5 million.

44.     As the amount of liability against the Debtor rose in the Arbitration, it became clear that the only likely source of payment of any award rendered against the Debtor in the Arbitration was the Debtor's allocation of Brownfield Tax Credits, to be received by Carrier from the State of New York.

45.     Accordingly, on August 6, 2019, Plaintiffs filed a second special proceeding in aid of arbitration seeking an additional order of attachment and a temporary restraining order (TRO) with respect to certain Brownfield Tax Credits in which the Debtor has an interest in the amount of $1,924,241—the same Brownfield Tax Credits at issue here. (*CSC 4540, LLC et al. v. Vernon 4540 Realty LLC, et al.*, Index No. 654464/2019 (Sup. Ct, N.Y. Cty., filed Aug. 6, 2019) (the "2019 Special Proceeding"))

46.     On August 7, 2019, the Court granted the TRO in the 2019 Special Proceeding in

the amount of $500,000. A copy of the Order to Show Cause granting the TRO is attached hereto as **Exhibit H**. The TRO remained in place until November 12, 2019, when the Court issued a Decision & Judgment, attached hereto as **Exhibit I**, granting Plaintiffs' motion for an order of attachment in aid of arbitration, and ordering the attachment of $1,924,241 in Brownfield Tax Credits that the Debtor may be entitled to pending the outcome of the Arbitration.

47.     In granting the order of attachment, the Court explained that, absent attachment of the Brownfield Tax Credits due to the Debtor, "any potential arbitration award in [the Plaintiffs'] favor may be rendered ineffectual due to the [Debtor's] apparent inability to pay it." (Ex. I at 8).

48.     Because of the disregarded status of the Debtor as a taxpayer, Plaintiffs could not effectuate the attachment of the Debtor's allocation of Brownfield Tax Credits until Carrier files the Debtor's tax return and receives the Tax Refund from the State.

**F.      The Debtor's Schedules of Assets and Statement of Affairs List Certain Brownfield Tax Credits as Property of the Estate, But Not Others**

49.     On its schedules filed on October 18, 2020, the Debtor listed $13.5 million in Brownfield Tax Credits related to redevelopment of the Property (*i.e.*, the tangible property credit component) as an asset of the Estate. (*See* ECF Doc. No. 10 at 3).

50.     However, Carrier claimed in the recent Section 341 Hearing that the Brownfield Tax Credits listed on the Debtor's schedules were only in connection with "the tangible portion of the tax credit," which the Debtor estimates to be worth "about $13.5 million to Debtor." (*See* Ex. C, at 59:6-11). Carrier added that that the refund from the tangible property credit component was "not due and payable until . . . a structure is built and occupied on the [Property]." (*Id.* at 59:11-13). No date for any such structure has been set, and it remains unclear whether such tangible property credits will ever be earned.

51.     The Debtor's schedules failed to list Brownfield Tax Credits in connection with the site preparation and cleanup (*i.e.*, the site preparation credit component) as an asset of the Estate.

52.     Believing that had to be an oversight by the Debtor, Plaintiffs reached out to the Debtor's counsel to inquire whether Carrier would sign a formal stipulation, attached hereto as **Exhibit J**, agreeing to transfer and deliver all Brownfield Tax Credits received by him into the Estate "for appropriate estate purposes in accordance with the provisions of the Bankruptcy Code." (Ex. J at 2).

53.     Carrier, however, refused to sign the stipulation or otherwise commit to deliver the Brownfield Tax Credits in connection with the site preparation and cleanup to the Estate.

54.     He instead took the position during the Section 341 Hearing that the site preparation credit component was not the property of the Estate because it was already "earned and allocated," although it has not been paid.  (Ex. C at 96:2-4).  Specifically, he is contending that although allocated to the Debtor pursuant to the CSC Operating Agreement, the Brownfield Tax Credits and ensuing cash refund became his, when he, as managing member of the Debtor unilaterally allocated the credits to himself.

55.     Carrier takes this position notwithstanding that the Debtor, not he, applies for the Brownfield Tax Credits from New York State.  Indeed, during the Section 341 Hearing in this matter, Carrier testified under oath that "the Debtor makes the application [for all Brownfield Tax Credits]," and that "[t]he funds flow through to the New York State entity that pays the taxes," (*i.e.*, Carrier, as the managing member and taxpayer of the Debtor). (*Id.* at 110:7-8, 11-12).

**G.     Payment of the Debtor's Brownfield Tax Credits to
         Carrier Is Imminent**

56.     Carrier further testified during the Section 341 Hearing that there is an application for Brownfield Tax Credits that he made for the Debtor that is currently pending with New York State. (*See id.* at 112:13-16).

57.     Upon information and belief, this application for Brownfield Tax Credits made by Carrier on behalf of the Debtor is in connection with the site preparation and cleanup of the Property (*i.e.*, the site preparation credit component).  Indeed, by Carrier's own admission, the site preparation credit component is the only Brownfield Tax Credit than can be applied for and paid out by the State at this time.  (*See id.* at 59:11-13) (testifying that redevelopment of the Property has not yet occurred and, thus, the tangible property credit component of the Brownfield Tax Credits is not "due and payable").

58.     Carrier further admitted during the Section 341 Hearing that the Debtor filed for $8.3 million of qualifying expenditures related to Brownfield Tax Credits in 2016, but has only received $44,000 in brownfield tax credits from the Debtor's 2017 application to date. (*See id.* at 120:17-23; 112:21-23). Presumably, this 2017 application was in connection with the Debtor's minimal remediation of the Property prior to contributing it to CSC in exchange for its Class B Membership. (*See id.* at 112:21-23).

59.     Accordingly, the Debtor's 2016 application for Brownfield Tax Credits in connection with qualifying expenditures from 2016—all of which were site preparation and cleanup costs—remains outstanding and payable by the State of New York.  The Debtor's 2017, 2018 and 2019 applications for Brownfield Tax Credits may also be outstanding. (*See id.* at 112:13 – 114:8).

60.     Carrier also testified that Brownfield Tax Credits related to site preparation and

cleanup costs were not the property of the Debtor, an ostensibly unilateral determination made by him. (*See id.* at 98:8) (noting that "[a]nything previous [to the tangible property credit component], the [Debtor] has no control over.").

61.     Based on Carrier's testimony and because the Debtor is a limited liability company that has not elected to be treated as a corporation for tax purposes, payment of Brownfield Tax Credits will be made by the State of New York to Carrier on behalf of and for the benefit of the Debtor.  Carrier is merely an instrument needed to effect obtaining the Tax Refund.  Indeed, were Debtor a corporation, Carrier would be unnecessary: the Tax Refund would be made directly to the Debtor as the taxpayer and be property of the Estate.  Carrier is thus requesting that this Court ignore the corporate form for his own benefit and to the exclusion of creditors of the Estate.

62.     Notwithstanding that these funds are the property of the Debtor, Carrier has claimed to the prejudice of the creditors of an estate for which he is the estate fiduciary that these funds, when received, belong to him and he refuses to commit to deliver them to the Estate.  This is clearly improper and unfortunately necessitates the filing of this action.

63.     While the Debtor's 2016 amended Schedule K-1 is subject to an ongoing audit, that audit is scheduled to conclude by year-end, meaning the Tax Refund due to Debtor will be paid to Carrier shortly thereafter.  In other words, Carrier's receipt of the Tax Refund amounting to at least $1.9 million (*see* Ex. F, at 3 of 5 under "Partner's credit information") and up to as much as $2.3 million is imminent, and tax refunds from the Debtor's 2017, 2018 and 2019 Brownfield Tax Credit applications totaling approximately $163,000 are soon to follow.

64.     Carrier must not be permitted to retain these Debtor funds for his personal benefit. They should be deposited into the Estate and held for the benefit of the creditors of the Estate.

This is especially true because this Estate has only $23.04 in liquid assets to potentially make a distribution to creditors under a plan of reorganization. (*See* ECF Doc. No. 10 at 1). Alternatively, Carrier should be enjoined from withdrawing, transferring, pledging, allocating, encumbering, assigning, dissipating, concealing or otherwise diminishing the value of these funds pending further order of the Court concerning the claims at issue in this adversary proceeding. Any other result while the Debtor is in bankruptcy would invariably benefit the insider of the Estate and prejudice its creditors.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**(Declaratory Judgment - 28 U.S.C. § 2201 *et. seq*.,)**

65.    The allegations set forth above are incorporated here by reference.

66.    The Declaratory Judgment Act, 28 U.S.C. §2201 *et. seq*., authorizes (with certain limitations not relevant here) any court of the United States, in cases of actual (justiciable) controversy within the jurisdiction of those courts, to declare the rights and other legal relations of any interested party seeking such declaration. Further, any such declaration shall have the force and effect of a final judgment or decree, and further necessary or proper relief based on a declaratory judgment or decree may be granted. Federal Rule of Bankruptcy Procedure 7065 sets out the procedural guidelines for application of this Act in Bankruptcy cases.

67.    The matters that are the subject of this Adversary Complaint constitute an actual legal and substantial justiciable controversy within the jurisdiction of this Court.

68.    The LLC Agreement explicitly allocates one-half of all Brownfield Tax Credits earned by CSC to the Debtor.

69.    However, because the Debtor is a limited liability company that has not elected to be treated as a corporation for tax purposes, any Brownfield Tax Credits allocated to it by the

State of New York can only be paid directly to its principal and managing member, Carrier.

70.     Under Section 541 of the Bankruptcy Code, the commencement of a case creates an estate that is comprised of "all legal or equitable interests of the debtor in property as of the commencement of the case" wherever that property is located and whomever held.

71.     The Brownfield Tax Credits are property of the Debtor's Estate.

72.     Carrier has testified that he has applied for the Brownfield Tax Credits and that he will not willingly turn the Tax Refund over to the Debtor.

73.     Plaintiffs are entitled to a declaratory judgment expressly finding that the Brownfield Tax Credits are property of the Estate and not the property of Carrier.

74.     Such a declaration will terminate the substantial and actual controversy between the parties and benefit the estate and its creditors enabling this Estate that has only $23.04 in liquid assets to potentially make a distribution to creditors under a plan of reorganization.[3] (*See* ECF Doc. No. 10 at 1).

## SECOND CLAIM FOR RELIEF
### (Turnover – 11 U.S.C. § 542)

75.     The allegations set forth above are incorporated here by reference.

76.     Section 542(a) of the Bankruptcy Code provides that a noncustodial entity who has possession, custody, or control of property of the estate that the trustee may use, sell, or lease under § 363, must deliver that property to the Debtor.

77.     The Brownfield Tax Credits are property of the Estate.

78.     Carrier is in control of property of the estate.

79.     Carrier is or will soon be in possession of the Brownfield Tax Credits.

---

[3] Plaintiff do not concede that the Debtor has any possibility of reorganizing or filing a plan. As noted by the Assistant United States Trustee during the Section 341 Hearing, the Debtor's ability to reorganize is suspect and dubious at best. (*See* Ex. C at 85:16-22).

80.    Plaintiffs are entitled to an order of the Court requiring Carrier to turn over the Brownfield Tax Credits upon receipt of the Tax Payment, and to account for such property.

### THIRD CLAIM FOR RELIEF
**(Preliminary and Permanent Injunctive Relief– 11 U.S.C. § 105(a))**

81.    The allegations set forth above are incorporated here by reference.

82.    Plaintiffs seek an injunction under section 105(a) preventing Carrier from withdrawing, transferring, pledging, allocating, encumbering, assigning, dissipating, concealing, or otherwise diminishing in value the Tax Refund from the Brownfield Tax Credits issued by the State of New York pending further order of the Court concerning the claims at issue in this adversary proceeding.

83.    Section 105(a) of the Bankruptcy Code authorizes the Court to issue "any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." Specifically, section 105(a) authorizes the Court to issue any orders that will further the purposes and goals of the Bankruptcy Code, assist in the orderly and effective administration of the Debtor's bankruptcy case, aid in the preservation of the assets of the Debtor's estate, and aid in the maximization of recovery to all of the Debtor's creditors.

84.    Section 105(a), combined with sections 363 and 542 of the Bankruptcy Code provides the statutory mechanism to enjoin Carrier from dissipating, transferring, selling, allocating, or otherwise disposing of the Brownfield Tax Credits received by him from the State of New York on behalf of the Debtor pending further order of the Court to ensure that estate assets are protected and properly marshalled for the benefit of creditors and not taken and used by Carrier, as he has stated he will, for his own personal benefit.

85.    Denial of Plaintiffs' request for a temporary restraining order and preliminary injunction would allow Carrier's continuing and promised conduct to irreparably harm the estate,

expose the Debtor's estate to considerable loss, possible additional claims, and have a materially adverse impact on the rights of creditors. Granting the relief sought will aid in the protection of the Debtor's estate and help ensure the orderly and proper administration of this estate.

86.     The balance of hardships weighs heavily in favor of granting the requested relief, for all the reasons cited above. Further, granting injunctive relief will serve the public interest in effective and orderly administration of the bankruptcy estate.

87.     The very nature of the injunction sought requires issuance of a temporary restraining order under Rule 7065, pending a hearing on the accompanying motion for a preliminary injunction. Such a temporary restraining order is properly granted to preserve the status quo and prevent irreparable injury to both Plaintiffs and the Estate and the Estate's ability to maximize the return to their creditors pending a preliminary injunction hearing. Furthermore, under the facts and circumstances represented in these proceedings, Plaintiffs respectfully submit that as they are acting in the interest of the estate and all of its creditors because the fiduciary in control of the Debtor is acting contrary to his fiduciary duties that they not be required to provide any security which the Court pursuant to Bankruptcy Rule 7065(c) or that the Court set the amount of the security at $1.

88.     For all of the reasons set forth above in support of Plaintiffs' request for a preliminary injunction, it is similarly appropriate to grant a temporary restraining order pending a hearing on the accompanying motion for a preliminary injunction restraining and enjoining Carrier from dissipating, transferring, selling, allocating, or otherwise disposing of the Brownfield Tax Credits received by him from the State of New York on behalf of the Debtor pending further order of the Court concerning the claims asserted in this adversary proceeding.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against Debtor and Carrier (i) declaring that the Brownfield Tax Credits allocated to Debtor are property of the Estate; (ii) ordering turnover of any and all Brownfield Tax Credits received by Carrier; or, in the alternative, (iii) enjoining and temporarily restraining Carrier from dissipating, transferring, selling, allocating, or otherwise disposing of the Brownfield Tax Credits received by him from the State of New York on behalf of the Debtor pending further order of the Court concerning the claims asserted in this adversary proceeding; and (iv) such other relief as the Court deems just and proper.

Dated: New York, New York
November 9, 2020

MORRISON COHEN LLP

By: _____ /s/ Joseph T. Moldovan_____
Joseph T. Moldovan
David J. Kozlowski
Latisha V. Thompson
Christopher W. Pendleton
909 Third Avenue
New York, New York 10022
(212) 735-8600

*Attorneys for CSC 4540, LLC, 45-50 Vernon LP, JSMB 4540 LLC and JSMB 4540 MM LLC*